UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRENDA I. RAMOS,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

13-CV-6503P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Brenda I. Ramos ("Ramos") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 15).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 14). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.   Procedural Background

Ramos applied for SSI/DIB on September 27, 2010, alleging disability beginning on June 15, 2010, due to diabetes and cataracts in both eyes.  (Tr. 133-46, 158, 162).[1]  On January 4, 2011, the Social Security Administration denied Ramos's claim for benefits, finding that she was not disabled.  (Tr. 55-56).  Ramos requested and was granted a hearing before Administrative Law Scott M. Staller (the "ALJ").  (Tr. 71-72, 103-07).  The ALJ conducted a hearing on December 6, 2011.  (Tr. 29-54).  In a decision dated March 6, 2012, the ALJ found that Ramos was not disabled and was not entitled to benefits.  (Tr. 16-26).

On July 24, 2013, the Appeals Council denied Ramos's request for review of the ALJ's decision.  (Tr. 1-5).  Ramos commenced this action on September 18, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### II.   Relevant Medical Evidence[2]

#### A.   Treatment Records

##### 1.   Hyun Yoo, MD

Treatment notes indicate that Ramos began receiving treatment with Hyun Yoo ("Yoo"), MD, in July 2011.  (Tr. 232).  According to the notes, Ramos had a history of diabetes that had been uncontrolled for years due to lack of insurance.  (*Id.*).  Ramos reported chronic headaches and eye pain, and that she had been diagnosed with glaucoma/cataracts and advised by the eye clinic that she needed to regulate her blood sugar levels prior to treatment.  (*Id.*).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

Upon examination, Ramos's eyes were reactive to light. (*Id.*).  Treatment notes indicate that

Ramos was taking Wellbutrin and Lexapro to address her ongoing depression. (*Id.*).

        Ramos returned for another appointment with Yoo on August 2, 2011.  (Tr. 229).

During that appointment, her blood sugar levels showed improvement, and she requested a

referral to the eye clinic to address her cataracts/glaucoma/retinopathy. (*Id.*).  Ramos returned to

Yoo on August 23, 2011 and reported that she had chronic blurry vision and had not yet seen her

ophthalmologist.  (Tr. 228).  Yoo opined that Ramos's diabetes was better maintained, but that

she had not yet achieved her goal. (*Id.*).

        On September 27, 2011, Ramos attended a follow-up appointment with Yoo.

(Tr. 227).  During that appointment, Yoo again observed that Ramos's eyes were reactive to

light. (*Id.*).  Yoo noted that her blood glucose levels had improved and that she continued to take

Wellbutrin for depression. (*Id.*).

### 2.      **Rochester General Hospital Records**[3]

        Treatment records indicate that Ramos received treatment at the Ophthalmology

clinic at Rochester General Hospital ("RGH") beginning in March 2011.  (Tr. 248-49).  The

treatment notes indicate that she was evaluated for cataracts and that her vision was corrected to

20/60 in her right eye and 20/50 in her left eye. (*Id.*).  Treatment notes indicate that surgery for

cataracts was considered, but that Ramos's glucose levels were not controlled at the time. (*Id.*).

Ramos returned to the clinic on November 29, 2011.  (Tr. 250-51).  Ramos was referred for a

cataract evaluation. (*Id.*).  The treatment notes also suggest that Ramos complained that her

prescription glasses were not effective. (*Id.*).

---

        [3] These records are handwritten and often hard to decipher.  The Court has summarized the relevant legible
treatment notes.

Ramos returned to the clinic on December 19, 2011. (Tr. 255-57). Treatment notes indicate that Ramos's vision was corrected to 20/60 in her right eye and 20/50 in her left eye. (*Id.*). Again, the notes indicate that Ramos should have a cataract evaluation. (*Id.*).

### 3.      Genesee Mental Health Center

The record contains treatment notes from Genesee Mental Health Center ("GMHC") beginning in February 2011. (Tr. 207). On February 21, 2011, Ramos met with a licensed social worker, Shawn Parker ("Parker"). (*Id.*). During the meeting, Ramos reported experiencing hypervigilance and negative ruminations. (*Id.*). Parker noted that Ramos appeared well-groomed, was cooperative, used appropriate speech and that her thought processes and content were logical and goal-directed. (*Id.*). According to Parker, Ramos appeared hyperactive and restless and demonstrated racing thoughts, negative ruminations and a depressed and anxious mood. (*Id.*). Parker recommended ongoing therapy, a psychiatric evaluation and a medication consultation. (*Id.*). Ramos was diagnosed with major depressive disorder, moderate and post-traumatic stress disorder. (Tr. 208).

On March 11, 2011, Ramos attended another appointment with Parker. (Tr. 212). During the appointment, Ramos reported that her mother had passed away unexpectedly the previous week and that she had been experiencing low moods, sleeplessness and tearfulness. (*Id.*). Ramos was considered for partial hospitalization at Strong due to her ongoing depression. (*Id.*). Ramos was given a seven-day supply of Lexapro. (*Id.*).

On March 17, 2011, Ramos returned for another appointment with Parker. (Tr. 213). Ramos reported that her mood had improved, her anxiety had decreased and she had been sleeping better. (*Id.*). Although Ramos remained interested in participating in the partial

hospitalization program, she lacked transportation and the referral was canceled.  (*Id.*).  During the appointment, Ramos demonstrated a mildly depressed and anxious mood.  (*Id.*).

On March 31, 2011, Ramos attended another session with Parker.  (Tr. 214).  During the session, Ramos reported that her mood had improved, but she continued to experience low moods at times.  (*Id.*).  Ramos reported that she continued to experience hypervigilance when others were cooking and that she experienced difficulty cooking due to her fire-related fears.  (*Id.*).

On April 8, 2011, Ramos met with JoAnn Streb ("Streb"), a nurse practitioner.  (Tr. 216).  Streb diagnosed Ramos with major depressive disorder, post-traumatic stress disorder and assigned her a Global Assessment of Functioning ("GAF") of 45.  (*Id.*).  The treatment notes indicate that Ramos lost her possessions and two dogs during a 2009 fire .  (*Id.*).  According to Ramos, her nightmares and flashbacks had decreased in frequency since she had started taking Lexapro.  (*Id.*).  Ramos also reported that her depression and anxiety were better.  (*Id.*).

On April 25, 2011, Ramos attended another session with Parker to address her ongoing hypervigilance and racing thoughts.  (Tr. 219).  Ramos reported experiencing little to no mood disturbance, but continued to experience hypervigilance, particularly when others were cooking.  (*Id.*).  According to Parker, Ramos's thought content was goal-directed and phobic, and she exhibited an anxious mood.  (*Id.*).  On May 3, 2011, Ramos met with Streb and reported good sleep, no nightmares or crying and less anxiety.  (Tr. 220-21).

On May 9, 2011, Ramos attended another session with Parker to address her negative ruminations and anxiety.  (Tr. 222).  According to Parker, Ramos exhibited mild negative ruminations and a depressed and anxious mood.  (*Id.*).  Parker recommended ongoing therapy.  (*Id.*).  Ramos returned on May 24, 2011, and reported high anxiety during a family

barbecue and a reoccurrence of symptoms she experienced after the fire in 2009.  (Tr. 223).

Parker noted that Ramos demonstrated phobic thought processes and an anxious mood.  (*Id.*).

On June 7, 2011, Ramos returned and reported symptoms of grief, low mood and negative

ruminations.  (Tr. 224).  Parker noted that Ramos demonstrated negative rumination and mildly

depressed and anxious mood.  (*Id.*).

On June 29, 2011, Ramos attended an appointment with Streb.  (Tr. 225).  During

the appointment, Ramos reported increased symptoms of post-traumatic stress disorder and

reported experiencing good days and bad days.  (*Id.*).  On July 6, 2011, Ramos attended an

appointment with Parker and reported experiencing symptoms of hypervigilance, flashbacks and

low mood.  (Tr. 246).  According to Ramos, she had witnessed a car fire in her neighborhood.

(*Id.*).  Parker recommended that Ramos continue therapy and attempt to cook one meal a week.

(*Id.*).

Ramos saw Parker again on July 19, 2011.  (Tr. 245).  Ramos reported

experiencing shortness of breath, increased heart rate and hypervigilance.  (*Id.*).  According to

Ramos, she had followed through with Parker's recommendation that she try cooking and agreed

to attempt four meals in the next two weeks.  (*Id.*).  On August 2, 2011, Ramos attended another

appointment with Parker.  (Tr. 244).  During the appointment, Ramos reported experiencing

shortness of breath, rapid breathing and intrusive thoughts.  (*Id.*).  Ramos had prepared two

meals and reported that although her anxiety was initially high, it eventually diminished during

the meal preparation.  (*Id.*).

On August 16, 2011, Ramos attended an appointment with Parker, complaining of

increased heart rate, shortness of breath and hypervigilance.  (Tr. 243).  Ramos reported that she

had written a letter to her deceased dogs and wanted to release the letter in a symbolic way.

(*Id.*).  Parker suggested that Ramos attempt to observe her husband light a charcoal grill and noted that they would discuss Ramos's possible obsessive-compulsive symptoms during the next session.  (*Id.*).  On August 30, 2011, Ramos returned for another session with Parker.  (Tr. 242).  During the session, Ramos reported experiencing low mood and that she had been unable to complete her assigned tasks because she had reacted negatively to smoke alarm noises.  (*Id.*).

On September 26, 2011, Ramos attended an appointment with Streb and reported that she was doing well on her medication regimen.  (*Id.*).  According to Ramos, her nightmares had decreased in frequency and she had experienced an improved lifestyle.  (*Id.*).  On October 11, 2011, Ramos attended an appointment with Parker.  (Tr. 235).  During the appointment, Ramos reported experiencing symptoms of low mood, interpersonal conflict, pessimistic thoughts and isolation.  (*Id.*).  According to Ramos, she felt overwhelmed by family commitments, including babysitting for relatives.  (*Id.*).

Ramos returned for a session with Parker on October 26, 2011.  (Tr. 234).  Ramos reported experiencing symptoms of low energy, low motivation, irritability and fearfulness. (*Id.*).  Ramos also attended an appointment with Parker on November 8, 2011.  (Tr. 233). During that appointment, Ramos reported ongoing feelings of low mood and negative ruminations.  (*Id.*).

**B.**    **Medical Opinion Evidence**

**1.**    **Benjamin Kropsky, MD**

On November 4, 2010, state examiner Benjamin Kropsky ("Kropsky"), MD, conducted a consultative internal medicine examination of Ramos.  (Tr. 199-202).  Ramos reported suffering from diabetes since 2001.  (*Id.*).  According to Kropsky, there was no evidence of neuropathy, nephropathy or retinopathy.  (*Id.*).  Kropsky noted that Ramos suffered

from cataracts bilaterally, requiring surgery.  (*Id.*).  According to Kropsky, Ramos suffered from blurry and decreased vision bilaterally.  (*Id.*).  Ramos reported that she is unable to prepare meals due to her impaired vision, but is able to clean and do laundry on a weekly basis.  (*Id.*).  Ramos reported that she could maintain her own personal hygiene, but that she did not do any shopping.  (*Id.*).

Upon examination, Kropsky noted that Ramos had a normal gait and was able to walk on her heels and toes and perform a full squat.  (*Id.*).  She used no assistive devices and had no difficulty getting on and off the exam table or changing for the exam.  (*Id.*).  She was able to rise from her chair without difficulty.  (*Id.*).

Kropsky noted that Ramos's cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Kropsky identified no scoliosis, kyphosis or abnormality in her thoracic spine.  (*Id.*).  The straight leg raise was positive on both sides at sixty to seventy degrees on the right and seventy to eighty degrees on the left with pain in the thigh.  (*Id.*).  Kropsky found full range of motion in the shoulders, elbows, forearms and wrists.  (*Id.*).  He also found full range of motion in the left hip, knees and ankles bilaterally, but noted right hip flexion was ninety degrees.  (*Id.*).  Kropsky assessed strength as five out of five in the upper and lower extremities.  (*Id.*).  Kropsky found Ramos's hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally.  (*Id.*).

Kropsky diagnosed Ramos with diabetes mellitus, asthma, hypertension and cataracts.  (*Id.*).  He opined that Ramos is "limited [from] activities which require fine visual acuity secondary to the cataracts" and should avoid smoke, dust and other known respiratory irritants.  (*Id.*).

2.      **Stephen Doro, MD**

On December 21, 2010, Stephen Doro ("Doro"), MD, conducted an eye examination of Ramos.  (Tr. 203-05).  According to his report, Ramos reported that she had been diagnosed with cataracts and that she had experienced episodes of photophobia and red eye in both eyes.  (*Id.*).  Upon examination, Doro noted that Ramos's uncorrected vision was 20/200 in her right eye and 20/200 in her left eye.  (*Id.*).  Ramos's corrected vision was 20/60 in her right eye and 20/70 in her left eye.  (*Id.*).  Doro opined that Ramos's intraocular pressure was 19 in her right eye and 20 in her left eye.  (*Id.*).  Doro observed pigment on the anterior lens face with some fibrosis of the anterior capsule in both eyes.  (*Id.*).  According to Doro, he did not observe any neovascularization or diabetic retinopathy, but noted that the view was blurred by the lens changes.  (*Id.*).  Doro observed that Ramos's fields were constricted in both eyes.  (*Id.*).  Doro opined that Ramos did not suffer from ophthalmoscopically visible diabetic retinopathy, but did suffer from cataracts in both eyes as a consequence of episodes of iritis.  (*Id.*).  According to Doro, Ramos's reported photophobia and red eye were consistent with his diagnosis.  (*Id.*).  Doro also conducted a Goldmann perimetry test on Ramos.  (*Id.*).  The handwritten results of the testing are difficult to decipher, but appear to range between twenty and thirty in Ramos's left eye and between ten and thirty in Ramos's right eye.  (*Id.*).

III.      **Non-Medical Evidence**

In her application for benefits, Ramos reported that she was born in 1967.  (Tr. 127).  Ramos stated that she had completed the eighth grade and had previously been employed as a hotel cleaner and a supervisor.  (Tr. 163).

Ramos reported that she did not care for any family members or pets and was unable to prepare meals due to her blindness. (Tr. 169). Ramos reported that she does not complete household chores or yard work because of her vision difficulties and that she travels using public transportation, but is unable to travel alone. (Tr. 170). According to Ramos, she goes grocery shopping twice a month for approximately two hours. (Tr. 171). Ramos does not socialize, but attends church every Sunday. (*Id.*). According to Ramos, her impairments limit her ability to walk alone, climb stairs, kneel, squat and see. (Tr. 172). Ramos estimated that she can walk three blocks before she must rest for approximately four minutes. (Tr. 173).

During the administrative hearing, Ramos testified that she previously worked as a housekeeper and housekeeping supervisor at two hotels. (Tr. 36-37). According to Ramos, she left her employment due to her vision problems. (Tr. 37). Ramos testified that she had completed the ninth grade. (Tr. 36). Ramos testified that she suffers from diabetes, asthma, high blood pressure and cataracts in both eyes. (Tr. 38). According to Ramos, her vision is very blurry and prevents her from reading or traveling without assistance. (Tr. 39). Ramos testified that she sometimes sees spots and suffers from headaches when she attempts to focus her eyes to read or watch television. (Tr. 44).

Ramos testified that she is unable to prepare meals, but is able to care for her personal hygiene. (Tr. 40). Ramos also testified that she performs household chores with the assistance of her husband. (*Id.*). Ramos also accompanies her husband when he goes grocery shopping. (*Id.*).

Ramos testified that she suffers from depression. (Tr. 40-41). According to Ramos, her depression causes her to cry or isolate herself in her bedroom, and disturbs her sleep. (*Id.*). According to Ramos, she lost all her possessions and her dogs in an apartment fire a few

years earlier. (*Id.*). She now suffers panic attacks due to the fire. (*Id.*). Ramos testified that she gets along with others, but no longer attempts to socialize or leave the house. (Tr. 42). Ramos receives mental health treatment twice a week, and a doctor monitors her medications monthly. (Tr. 43). Ramos testified that she believes the mental health treatment has helped. (*Id.*).

A vocational expert, Bassey A. Duke ("Duke"), also testified during the hearing. (Tr. 47-54, 130-31). The ALJ first asked Duke to characterize Ramos's previous employment. (Tr. 47). According to Duke, Ramos previously had been employed as a housekeeper and a housekeeping supervisor. (*Id.*).

The ALJ then asked Duke whether a person would be able to perform Ramos's previous jobs who was the same age as Ramos, with the same education and vocational profile, and who was able to understand, remember and follow only simple instructions, make judgments on simple work-related decisions, work appropriately with supervisors and workers in a routine setting, respond to usual work situations and changes in a routine work setting, maintain attention and concentration for two-hour segments over an eight-hour work period, complete a normal workweek without excessive interruptions but needed verbal instructions, who could perform the full range of medium work, but had to avoid all exposure to dangerous moving machinery, unprotected heights, dusts, fumes, gases, odors, poor ventilation and other pulmonary irritants, who could only handle and work with large objects, but could avoid ordinary hazards in the workplace. (Tr. 48-49). Duke testified that such an individual would be unable to perform the previously-identified jobs, but would be able to perform other positions in the national economy, including [hand] packager, dry cleaning or laundry worker, and dishwasher. (Tr. 49). The ALJ then asked Duke whether jobs would exist for the same individual with the same limitations, except that the individual would be unable to avoid hazards in the workplace.

11

(Tr. 49-51).  Duke testified that such an individual could perform positions in the national economy, including dining room worker, receiving checker and warehouse worker.  (*Id.*).

The ALJ then asked Duke to assume the same limitations, along with an inability to see or handle large objects.  (Tr. 51).  Duke opined that such an individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).  The ALJ then asked Duke to assume the same limitations as the first hypothetical and to assume the individual would be off-task approximately twenty percent of the time.  (*Id.*).  Duke opined that such an individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).  The ALJ then asked Duke to assume the same limitations as the first hypothetical and to assume that the individual would miss work two or more days each month.  (*Id.*).  Duke opined that such an individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).

## DISCUSSION

### I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

   To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

   A person is disabled for the purposes of SSI and disability benefits if he or she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five steps are:

> (1)     whether the claimant is currently engaged in substantial
> gainful activity;
>
> (2)     if not, whether the claimant has any "severe impairment"
> that "significantly limits [the claimant's] physical or mental
> ability to do basic work activities";
>
> (3)     if so, whether any of the claimant's severe impairments
> meets or equals one of the impairments listed in Appendix
> 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)     if not, whether despite the claimant's severe impairments,
> the claimant retains the residual functional capacity to
> perform his past work; and
>
> (5)     if not, whether the claimant retains the residual functional
> capacity to perform any other work that exists in significant
> numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

> **A.      The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 16-26).  Under step one of the process, the ALJ found that Ramos has not

engaged in substantial gainful activity since June 15, 2010, the alleged onset date.  (Tr. 18).  At

step two, the ALJ concluded that Ramos has the severe impairments of obesity, asthma,

hypertension, diabetes mellitus, cataracts, major depressive disorder and post-traumatic stress

disorder.  (*Id.*).  At step three, the ALJ determined that Ramos does not have an impairment (or

combination of impairments) that meets or medically equals one of the listed impairments.
(Tr. 18-20).  With respect to Ramos's mental impairments, the ALJ found that Ramos suffers
from moderate difficulties in maintaining concentration, persistence or pace and mild difficulties
in social functioning and in performing activities of daily living.  (Tr. 19-20).  The ALJ
concluded that Ramos has the Residual Function Capacity ("RFC") to understand, remember and
follow simple instructions, make judgment on simple work-related decisions, interact
appropriately with supervisors and coworkers in a routine work setting, respond to usual work
situations and to changes in a routine work setting, maintain attention and concentration for
two-hour segments over an eight-hour period, complete a normal workweek without excessive
interruptions, but would need verbal instructions, and could perform the full range of medium
work and avoid ordinary hazards in the workplace, except that she must avoid exposure to
dangerous moving machinery, unprotected heights and pulmonary irritants and could only handle
and work with large objects.  (Tr. 20-21).  At step four and five, the ALJ determined that Ramos
was unable to perform her prior work, but that other jobs existed in the national and regional
economy that Ramos could perform, including the positions of hand packager, dry cleaning
worker and dishwasher.  (Tr. 24-26).  Accordingly, the ALJ found that Ramos is not disabled.
(*Id.*).

   **B.**   **Ramos's Contentions**

          Ramos contends that the ALJ's determination that she is not disabled is not
supported by substantial evidence and is the product of legal error.  (Docket # 11-1).  First,
Ramos contends that the ALJ erred because he failed to specifically consider whether Ramos's
impairments satisfied Listing 2.03.  (*Id.* at 12-14).  Second, Ramos contends that the ALJ's RFC
assessment is flawed because he failed to account for all of Ramos's visual limitations.  (*Id.* at

14-17).  Third, Ramos contends that the ALJ failed to properly assess her credibility.  (*Id.* at

17-18).  Finally, Ramos maintains that the ALJ's mental RFC assessment is flawed because it

was not based upon a medical opinion of Ramos's functional limitations.  (*Id.* at 19-22).


## II.   <u>Analysis</u>

### A.   <u>Duty to Develop the Record</u>

"It is well established in the Second Circuit that an ALJ is under an obligation to

develop the administrative record fully, to ensure that there are no inconsistencies in the record

that require further inquiry, and to obtain the reports of treating physicians and elicit the

appropriate testimony during the proceeding."  *Martello v. Astrue*, 2013 WL 1337311, *3

(W.D.N.Y. 2013).  "The ALJ's duty to develop the record is enhanced when the disability in

question is a psychiatric impairment."  *Estrada v. Comm'r of Soc. Sec.*, 2014 WL 3819080, *3-4

(S.D.N.Y. 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)).  Although the

regulations provide that the administration "'*will* request a medical source statement' containing

an opinion regarding the claimant's residual capacity," *Tankisi v. Comm'r of Soc. Sec.*, 2013 WL

1296489, *4 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. §§ 404.1513(b)(6),

416.913(b)(6)), the failure to obtain a report from a treating physician does not necessarily

warrant remand.  *See id.*  The fact that a claimant is represented during the administrative hearing

does not relieve the ALJ of his duty to develop the record.  *See id.* at *4 n.1 ("counsel's

responsibilities do not derogate from the ALJ's responsibility to investigate").

The ALJ retains discretion to determine whether a consultative examination is

necessary and is only required to order an examination where the record establishes that it is

necessary to enable the ALJ to render a decision.  20 C.F.R. § 404.1519.  Generally, an ALJ

must order a consultative examination when "[a] conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved." *Matejka v. Barnhart*, 386 F. Supp. 2d at 209 (citing 20 C.F.R. § 404. 1519a(b)(4)).

Although an ALJ is not required to request an opinion from a treating physician or to order a consultative examination in every case, generally "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y. 2010). Accordingly, although the RFC determination is an issue reserved for the Commissioner, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities," as a general rule, the Commissioner "may not make the connection himself." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted). This is particularly true where the record reflects that the claimant suffers from more than minor impairments. *See House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y. 2013).

Ramos contends that the ALJ's mental RFC assessment is not supported by substantial evidence because the ALJ relied on his own lay opinion in determining her mental functional capacities. (Docket # 11-1 at 19). In essence, Ramos argues that the ALJ failed to fulfill his duty to develop the record because he did not order a psychiatric consultative examination or contact Ramos's treating sources to request an opinion concerning Ramos's mental functional capacity. (Docket # 11-1 at 19-22). Although certain circumstances allow an ALJ "permissibly [to] render a common sense judgment about functional capacity even without a

physician's assessment," particularly where the medical evidence shows relatively minor

impairments, "*House v. Astrue*, 2013 WL 422058 at *4 (internal quotation omitted), those

circumstances are not present here.

   The record demonstrates that Ramos has received ongoing mental health

treatment to address her diagnosed mental impairments of depression and post-traumatic stress

disorder.  Ramos's mental impairments apparently stem from recent traumatic events in her life,

including a fire that destroyed her possessions and killed her dogs, as well as her mother's

unexpected death.  During the course of Ramos's treatment, she was referred for partial

hospitalization due to her ongoing depression, but did not attend the program after experiencing

some relief through her medication regimen.  Although the record demonstrates that some of

Ramos's symptoms were alleviated to some degree by medication, the record indicates that

Ramos continued to experience depressive symptoms, including low moods and negative

ruminations, and anxiety symptoms, including shortness of breath and intrusive thoughts.

   The ALJ thoroughly reviewed and discussed the treatment records, but did not

have a medical source statement or a consultative examination report to assist him in translating

the treatment notes into an assessment of Ramos's mental capacity for work-related activities.

Instead, the ALJ used his own lay opinion to determine Ramos's mental RFC.  This was error

considering that Ramos suffered from medically diagnosed mental impairments, received

ongoing treatment, and experienced continuing symptoms of depression and post-traumatic

stress disorder that could interfere with her ability to complete work-related activities.  *See*

*Haymond v. Colvin*, 2014 WL 2048172, *7-8 (W.D.N.Y. 2014) ("no psychiatrist, psychologist,

social worker, or counselor examined [p]laintiff and gave an opinion regarding the functional

limitations caused by her multiple and long-standing mental impairments[;] . . . [b]ecause the

record contains no assessment from an examining provider, much less a treating source,
quantifying [p]laintiff's mental limitations, the [c]ourt finds the record was not sufficiently
complete for the ALJ to render an accurate RFC"); *Walker v. Astrue*, 2010 WL 2629832, *7
(W.D.N.Y.) ("[g]iven the limited evidence in the record of plaintiff's functional limitations from
her mental impairments, including the lack of any treating or consultative opinions concerning
the extent of these limitations, I conclude that [the ALJ] should have ordered a consultative
psychological examination or attempted to contact plaintiff's treating physicians to complete the
record in order to make a proper RFC determination[;] . . . [the ALJ], as a layperson, could not
bridge the gap between plaintiff's [mental disorders] and the functional limitations that flow
from these impairments"), *report and recommendation adopted*, 2010 WL 2629821 (W.D.N.Y.
2010); *Vernon v. Astrue*, 2008 WL 5170392, *24 (S.D.N.Y. 2008) ("the ALJ's determination
that [p]laintiff's psychological impairments resulted in moderate restrictions cannot be said to be
based on any opinion or piece of evidence other than his lay inference and therefore cannot stand
without further explanation"); *see also Skupien v. Colvin*, 2014 WL 3533425, *6 (W.D.N.Y.
2014) ("remand is appropriate to allow the ALJ to obtain a physical RFC assessment or medical
source statement from an acceptable medical source"); *Gross v. Astrue*, 2014 WL 1806779, *18
(W.D.N.Y. 2014) ("[a]s a general rule, where the transcript contains only diagnostic evidence
and no opinion from a medical source about functional limitations . . . , to fulfill the
responsibility to develop a complete record, the ALJ must recontact the treating source, order a
consultative examination, or have a medical expert testify at the hearing") (internal quotations
omitted); *Kinslow v. Colvin*, 2014 WL 788793, *5 (N.D.N.Y. 2014) ("when no medical source
opinion supports an administrative law judge's residual functional capacity finding, that finding
lacks substantial evidentiary support").  By contrast, where the claimant did not receive

treatment for mental health issues or where the record contains a medical opinion assessing a claimant's mental capacity for work-related activities, a consultative psychiatric examination may not be necessary. *See*, *e.g.*, *Phelps v. Colvin*, 20 F. Supp. 3d 392, 401-02 (W.D.N.Y. 2014) (ALJ not required to order psychiatric consultative examination where record contained abbreviated references to potential ADD, but where claimant had not been diagnosed with or received treatment for ADD and the record otherwise demonstrated that claimant was functioning well); *Simon v. Colvin*, 2013 WL 4094612, *6-7 (W.D.N.Y. 2013) (ALJ not required to order a consultative psychiatric examination where record contained other psychiatric evaluations); *Ocasio v. Astrue*, 32 F. Supp. 3d 289, 295-96 (N.D.N.Y. 2012) (consultative psychiatric examination not required where plaintiff did not receive treatment for depression); *Serianni v. Astrue*, 2010 WL 786305, *5-6 (N.D.N.Y. 2010) (same).

In sum, I conclude that remand is appropriate for the ALJ to obtain a mental RFC assessment or medical source statement from an acceptable medical source concerning Ramos's mental capabilities.

## B.    **Step Three Determination**

Ramos contends that the ALJ erred when he concluded that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Specifically, Ramos contends that the ALJ failed to provide any analysis or explanation for his determination that she did not meet or medically equal the requirements of Listing 2.03.  (Docket # 11-1 at 12-14).  Ramos also argues that the evidence in the record supports the conclusion that she meets the requirements of Listing 2.03.  (Docket # 17 at 2).  The government disagrees, asserting that although the ALJ's analysis

at step three was minimal, Ramos has failed to present any evidence that she satisfies the requirements of Listing 2.03.  (Docket # 14-1 at 12-13).

If a claimant's impairments meet or medically equal the criteria set forth in Appendix 1 to Subpart P of Part 404 of the regulations, the claimant is automatically entitled to benefits.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) ("[t]he Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability") (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  The claimant carries the burden of demonstrating that her impairments meet or are equal in severity to one of the listings and in order to meet this burden, the claimant is required to show that her impairment meets each of the medical criteria set forth in the listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (impairment does not qualify if it "manifests only some of those criteria, no matter how severely").

An ALJ is required to explain his determination that a claimant failed to meet or equal the listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the [l]istings."  *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009).  Nevertheless, "[a]n ALJ's unexplained conclusion at step three of the analysis may be upheld where other portions of the decision and 'other clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence."  *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507-08 (S.D.N.Y. 2014) (citing *Berry*, 675 F.2d at 468 (affirming ALJ's decision at step three even though it did not provide a rationale "since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence")); *see also Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) ("[a]lthough we have cautioned that an ALJ should set forth a sufficient rationale in support of

his decision to find or not to find a listed impairment, the absence of an express rationale . . .

does not prevent us from upholding them so long as we are able to look to other portions of the

ALJ's decision and to clearly credible evidence in finding that his determination was supported

by substantial evidence") (internal quotations omitted); *Sava v. Astrue*, 2010 WL 3219311, *4

(S.D.N.Y. 2010) (affirming determination of ALJ at step three where there was "sufficient

uncontradicted evidence in the record to provide substantial evidence for [that] conclusion").  In

contrast, "where the evidence on the issue of whether a claimant meets or equals the listing

requirements is [in] equipoise and 'credibility determinations and inference drawing is required

of the ALJ' to form his conclusions at step [three], the ALJ must explain his reasoning."  *Ryan v.*

*Astrue*, 5 F. Supp. 3d at 507-08 (quoting *Berry*, 675 F.2d at 469).

Listing 2.03, entitled "Contraction of the visual field in the better eye," (the

"Listing") provides, in relevant part:

> A.   The widest diameter subtending an angle around the point of
>      fixation no greater than 20 degrees; or
>
> B.   An MD of 22 decibels or greater, determined by automated
>      static threshold perimetry that measures the central 30
>      degrees of the visual field; or
>
> C.   A visual field efficiency of 20 percent or less, determined by
>      kinetic perimetry.

20 C.F.R. Part 404, Subpt. P, App. 1. at § 2.03.  Thus, to establish that she meets the Listing,

Ramos must demonstrate that her better eye meets one of these three requirements.

The government contends that Ramos has not supplied evidence establishing that

she meets any of these requirements.  According to the government, with respect to the first

requirement, Doro's report can be interpreted to demonstrate that Ramos's fields of vision in

each eye reached up to thirty degrees.  (Docket # 14-1 at 13 (citing Tr. 205)).  With respect to the

second requirement, the government contends that there is no evidence in the record that Ramos has undergone an automated static threshold perimetric test.  (*Id.*).  Finally, with respect to the third requirement, visual efficiency is derived by "adding the number of degrees [an individual] see[s] along the eight principal meridians found on a visual field chart . . . in [an individual's] better eye and dividing by 5."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 2.00(A)(7)(c).  The government contends that Doro conducted perimetry testing, which demonstrated a visual efficiency of 40 in Ramos's left eye.[4]  (*Id.*).  Ramos contends that Doro's results are handwritten and unintelligible and that the evidence in the record otherwise suggests that Ramos's "fields are constricted in both eyes."  (Docket # 17 at 4).  According to Ramos, this evidence is sufficient to require an evaluation from the ALJ as to whether she met the Listing requirements.

Although the government may be correct that Doro's report suggests that Ramos's field of vision is not sufficiently constricted to meet the Listing requirements, the ALJ's determination does not reveal whether he considered the Listing at all, much less which of the Listing criteria he concluded were lacking.  Considering the ALJ's failure to address the Listing at all, and the fact that remand is otherwise warranted for the reasons discussed above, the ALJ should also consider and explain whether Ramos satisfies the requirements of the Listing.  The ALJ may choose to contact Doro if clarification or interpretation of his handwritten results would be helpful.  Although the ALJ may ultimately conclude that Ramos's impairments did not meet or equal the Listing, "this possibility does not relieve the ALJ of his obligation to discuss the potential applicability of Listing [2.03], or at the very least, to provide [Ramos] with an explanation of his reasoning as to why [Ramos's] impairments did not meet any of the listings." *Norman v. Astrue*, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012).

---

[4]  Reviewing the documented results of the perimetry test conducted by Doro suggests that the government calculated the visual efficiency in the left eye by interpreting the results along the eight meridians as follows: 30, 20, 25, 25, 30, 25, 25, 20.  A visual efficiency of 40 is calculated by adding these numbers and dividing by 5.

C.      **Ramos's Remaining Challenges**

Ramos also challenges the ALJ's physical RFC assessment on the grounds that it fails to account for all of her visual impairments, as well as the ALJ's credibility determination. Because the additional remand evidence could affect the ALJ's assessment of Ramos's credibility and her RFC, I do not reach whether substantial evidence supports the remaining challenged determinations. *See Jones v. Barnhart*, 2003 WL 941722, *13 (S.D.N.Y. 2003) ("[b]ecause we remand for the reason set forth above, and because there is additional evidence in the record that may impact the ALJ's assessment of [plaintiff's] credibility and his resolution of [plaintiff's] disability claim, we do not address here whether those determinations are supported by substantial evidence").


## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 14)** is **DENIED**, and Ramos's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**.  This matter is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


                                                    *s/Marian W. Payson*
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge


Dated:  Rochester, New York
        March 4, 2015

24